# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

BANK OF NEW YORK MELLON,
as Trustee for BS ALT A 2005-9,
      Plaintiff,

     v.

SONJA BELL and
JOHNATHAN BELL,
      Defendants.

No. 3:11-cv-1255 (JAM)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff is a bank that seeks foreclosure on the home of defendants Sonja and Johnathan Bell. The Court conducted a five-day bench trial in this matter from September 22 to September 26, 2014. For reasons set forth below, I conclude that plaintiff has proven all the requisites for a judgment of foreclosure and that the defendants' defenses are without merit.

### FINDINGS OF FACT

On June 17, 2005, defendant Sonja Bell closed on a loan and mortgage in the amount of $650,000 in connection with residential property at 54 Main Street in South Glastonbury, Connecticut. The original note, which was entered into evidence at trial, reflects Sonja Bell's blue-ink signature (Pl.'s Ex. 1), and the mortgage securing it also bears her signature and was duly recorded (Pl.'s Ex. 2). The attorney who represented her, James Wittstein, testified credibly at trial about the closing, at which he was present, and about related documentation.

Both of the Bells are well educated and have extensive professional work backgrounds. There is no question in my mind that they fully understood the nature of the mortgage transaction that Sonja Bell was entering into and the obligations to be undertaken.[1]

The proceeds of the loan, along with the proceeds of a second loan not at issue in this litigation, were used to satisfy an earlier mortgage on Sonja Bell's property (Pl.'s Exs. 94, 99), and the remaining balance after the satisfaction of her earlier mortgage was distributed directly to her (Pl.'s Exs. 96, 99). Both defendants testified that they have lived in and shared the home as husband and wife, and that Johnathan Bell took care of all matters relating to the mortgage and for which purpose he was made an authorized third party with the loan servicer (Pl.'s Exs. 53, 59). Testimony at trial established the property's current market value to be around $550,000 (Pl.'s Ex. 82).

The Bells made payments on the loan for about two years (Pl.'s Exs. 42–44). By early 2007, however, their payments had become irregular, and after a last payment in late September 2007, they stopped altogether (Pl.'s Exs. 44–47). Since then the Bells have continued to live in the house but have not made any mortgage payments. They have also failed to pay any of the real estate taxes, which have since been paid by the bank on their behalf.

The trial evidence showed numerous entities involved with the ownership and servicing of the Bells' mortgage, and its eventual placement into a pool of mortgages known as BS Alt A 2005-9. The note was originally in favor of Altara Home Mortgage, LLC (Pl.'s Ex. 1). Allonges that are attached to the note reflect its endorsement from Altara to Ohio Savings Bank; then from Ohio Savings Bank to JPMorgan Chase Bank, as Trustee; and in two successive allonges, apparently revised for clarity, from JPMorgan to the Bank of New York Mellon, as Trustee, and

---

[1] Defendants proceeded *pro se* at trial. Johnathan Bell has previously worked as a paralegal, and he conducted all of the defendants' case in court. Notwithstanding his lack of formal legal training, he proved himself to be an exceptionally bright, diligent, and resourceful trial advocate.

from JPMorgan to the Bank of New York Mellon, as Trustee for BS Alt A 2005-9 (*Ibid.*). In addition to the endorsements on the note allonges, the assignment of the mortgage to the Bank of New York, as Trustee for BS Alt A 2005-9, was recorded (Pl.'s Exs. 3-4).

EMC Mortgage Corporation was the loan's servicer until June 2006 (Pl.'s Ex. 42), when servicing was transferred to Wells Fargo and began to be performed by America's Servicing Company (ASC) (Pl.'s Exs. 43–47), which is a division of Wells Fargo that services loans originating from other lenders. Abundant evidence of Wells Fargo's right to service the Bells' mortgage loan was offered at trial, including powers of attorney granted by the Bank of New York to Wells Fargo (Pl.'s Exs. 24–31) and other documents relating to their custodial agreement (Pl.'s Exs. 32–34).

On June 18, 2007, ASC sent Sonja Bell a default and demand letter (Pl. Exs. 22, 53). Although the Bells dispute receiving the letter, I conclude by a preponderance of the evidence that the servicer sent it in accordance with testimony about its regular business practice and that the Bells received it. In any event, it is undisputed that by the summer of 2007, the Bells knew that they were not making their payments. Indeed, even apart from the formal default notice, the loan servicer repeatedly contacted the Bells. A letter from ACS's Borrower Counseling Services and addressed to Sonja Bell, dated May 3, 2007, memorializes a conversation in which, as the letter says, "we were unable to reach a mutual agreement regarding the options available to assist you with your current situation" (Pl.'s Ex. 64). The letter provided information about a credit counseling agency and requested further contact "as soon as possible" (*Ibid.*). The loan servicer attempted to contact the Bells by telephone many times in late May and early June 2007 and finally succeeded on June 14 (Pl.'s Ex. 53). Notations made in the call log indicate that the Bells were unable or unwilling to provide information or commit to payment (*Ibid.*). Other evidence

showed extensive efforts by the ACS loss mitigation department to negotiate a payment plan

with the Bells until December 2007 (Pl.'s Ex. 52). Even as late as August 2009, the Bells were

given an opportunity in light of their non-payment to engage in a "short sale" of their property to

avoid further collection activity or a foreclosure action (Pl's Ex. 73). On the basis of extensive

testimony at trial, it is clear that the bank tried to work with the Bells to give them an opportunity

to become current on the loan but that the Bells did not wish to pay or did not have enough

income or other resources to pay.

      This foreclosure action is the second that the bank has initiated to collect on the debt that

the Bells stopped paying more than seven years ago. The first foreclosure action was filed in

Connecticut Superior Court on September 6, 2007. A motion for summary judgment was granted

in the bank's favor, and on June 10, 2008, a judgment of strict foreclosure was entered and a law

day was set. *Bank of New York v. Bell*, 2011 WL 383843, at *1 (Conn. Super. Ct. 2011)

(summarizing procedural history). On the day before the law day, however, Sonja Bell filed for

bankruptcy, which opened the judgment and vacated the law day. *Ibid.* Litigation continued, and

from early 2009 its focus was the Bells' contention that the bank was not the true owner of the

note, which at that time had not been endorsed from JPMorgan to the Bank of New York. The

state court allowed a large volume of discovery on the enormously complex pooling and

securitization transaction that resulted in the Bell mortgage being placed into a pool along with

thousands of others, and on the plaintiff's relationship to the pool. *Id.* at *2–3. Eventually, as the

state court litigation bogged down, the bank moved to withdraw its action, in order to have

JPMorgan endorse the note to it and clarify its standing to foreclose; its motion to withdraw the

state court action was granted on January 4, 2011. *Id.* at *7.

The bank then set about to initiate the instant foreclosure action. On March 11, 2011, another default and demand letter was sent to Sonja Bell. It was sent by plaintiff's counsel to Sonja Bell's counsel in the state court action (Pl.'s Ex. 77). The Bells did not pay or otherwise cure the default. On August 9, 2011, the bank followed with this foreclosure action in federal court, invoking the Court's diversity jurisdiction under 28 U.S.C. § 1332. On the basis of evidence presented at trial, the debt as of September 22, 2014 (the first day of trial in this action) amounted to $997,357.14. This includes components for unpaid principal ($650,000), unpaid interest ($239,647.19), and unpaid real estate taxes ($107,709.95). Doc. #244 at 28–29.

## CONCLUSIONS OF LAW

I first discuss below the evidence that supports plaintiff's right to foreclose, before then discussing defendant's affirmative defenses to foreclosure.

### A. Plaintiff's Right to Foreclose

In order to succeed on a foreclosure action, plaintiff must establish three elements: (1) that it owns the secured debt, (2) that the defendants have defaulted on the note, and (3) that any conditions precedent to foreclosure established by the note or mortgage are satisfied. *See Wells Fargo Bank, N.A. v. Strong*, 149 Conn. App. 384, 392, 89 A.2d 392, *cert. denied*, 94 A.3d 1202 (2014); *GMAC Mortg., LLC v. Ford*, 144 Conn. App. 165, 176, 73 A.3d 742 (2013). I conclude that plaintiff has met all three elements.

### 1. Ownership of the Debt

Plaintiff in this case was in physical possession of the original note at issue when this action commenced, and submitted it as Plaintiff's Exhibit 1. As discussed in greater detail above, the original note now includes a chain of attached endorsements, culminating in an endorsement to plaintiff. I admitted the note with its attached endorsements into evidence at trial on the basis

of its credibility, and I cannot conclude that it is falsified or fabricated; my examination of the document did not raise any concerns in my mind about authenticity or other irregularity.

The Connecticut Supreme Court has held that the holder of a note secured by a mortgage is presumptively the owner of the debt and, unless the defendant rebuts that presumption, is thus entitled to foreclose. *RMS Residential Props., LLC v. Miller*, 303 Conn. 224, 231–32, 32 A.3d 207 (2011). That is true even when the holder of the note is not an assignee of the mortgage, because the state legislature has codified the common-law principle that the mortgage follows the note, providing that the owner of a debt secured by real property can foreclose on the property even without having been assigned the mortgage. *See* Conn. Gen. Stat. § 49-17. In the present case, however, plaintiff *is also* the assignee of the mortgage, and the assignment was recorded (Pl.'s Ex. 3).

Defendants have offered no persuasive evidence tending to rebut the presumption that plaintiff is the owner of the debt. Nor does the evidence show that any of the transfers, endorsements, or assignments was fabricated or ineffective. The Bells have not paid anyone for the debt for more than seven years. The fact that no other claimant has come forward to demand payment from the Bells is highly indicative that it is plaintiff who is the rightful claimant in this case.

Moreover, the Uniform Commercial Code, as adopted by the Connecticut legislature, provides that the holder of an instrument, or a nonholder in possession who has the rights of a holder, is entitled to enforce it. Conn. Gen. Stat. § 42a-3-301. A "holder" includes an entity in possession of an instrument payable to that entity or to the bearer, Conn. Gen. Stat. § 42a-1-201(b)(21), or endorsed in blank, Conn. Gen. Stat. § 42a-3-205, and the entity to whom an instrument is payable may be "identified in any way" and is determined by intent. Conn. Gen.

Stat. § 42a-3-110. Even in the absence of a blank or special endorsement, the law allows that the "transfer of an instrument . . . vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course," Conn. Gen. Stat. § 42a-3-203, and an instrument is so transferred whenever "it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." *Ibid.* Even an unendorsed note thus can still be transferred to a party who, though not becoming a "holder," will nevertheless acquire the right to enforce the note if that was the intent of the transferor. *See generally Strong*, 149 Conn. App. at 398 (discussing UCC requirements for "holder" status); *see also J.E. Robert Co., Inc. v. Signature Props., LLC*, 309 Conn. 307, 319–27, 71 A.3d 492 (2013) (holding that nonholder transferee was entitled to enforce note under Uniform Commercial Code); *Ulster Sav. Bank v. 28 Brynwood Lane, Ltd.*, 134 Conn. App. 699, 709–10, 41 A.3d 1077 (2012) ("[A] note that is unendorsed still can be transferred to a third party. Although that third party technically is not a holder of the note, the third party nevertheless acquires the right to enforce the note so long as that was the intent of the transferor.").

Plaintiff commenced this action with physical possession of the note, and the chain of endorsements on the note culminating in endorsement to the plaintiff is sufficiently clear to demonstrate intent under Connecticut law. Plaintiff is the holder of the note, the special endorsee of the note, and the transferee of the note. Moreover, plaintiff is the assignee of the mortgage, with the assignment properly recorded. It is abundantly clear that plaintiff owns the debt and is entitled to bring this foreclosure action.

      2.    *Default*

Defendants have failed to make any payments on the note since their last payment in September 2007. They have continued to live on the property but have done nothing since 2007 to pay or to cure their default despite ample opportunity to do so.

3.      *Conditions Precedent to Foreclosure*

The mortgage instrument requires that the lender "give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement" and that the notice specify: "(a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured . . . and foreclosure or sale of the Property" (Pl.'s Ex. 2 para. 22). The mortgage instrument further provides that if the default is not cured by the specified date, the lender may require immediate repayment in full without further demand and will be entitled to collect all expenses incurred in pursuing its remedies (*Ibid.*).

As discussed above, the loan servicer sent Mrs. Bell a default and demand letter on June 18, 2007 (Pl.'s Ex. 22), and the letter satisfied those conditions precedent to foreclosure. The letter (a) informed her of the default; (b) indicated that curing the default required bringing the loan current by paying the delinquency; (c) indicated that this must be done by July 18, 2007, thirty days after the date of the letter; and (d) warned her that unless her payments were brought current by that date, her mortgage note would be accelerated and foreclosure might be pursued (*Ibid.*).

The Bells contend that they never received the 2007 default letter, but as already stated above, I find by a preponderance of the evidence that they did, in accord with the loan servicer's business records and practice. It is clear from defendants' own testimony that they became aware

of the default, and the loan servicer repeatedly made contact with them before and after the default notice was mailed. The Connecticut Appellate Court has held that substantial compliance with mortgage notice provisions is sufficient and "literal enforcement . . . would serve no purpose" where the defendants have actual notice and are not harmed by deficient notice. *Fidelity Bank v. Krenisky*, 72 Conn. App. 700, 712, 807 A.2d 968 (2002).

In addition to the 2007 notice, a second default and demand letter was sent, this time through counsel, on March 11, 2011, prior to the commencement of this action (Pl.'s Ex. 77). There is no contention that the second letter was not received. The demand letter and subsequent correspondence (Pl.'s Ex. 78) fully explained the basis for liability. Either one of the two default letters from 2007 and 2011 would satisfy the condition precedent to foreclosure established by the mortgage instrument.

I conclude that plaintiff has met its burden on all elements for foreclosure.

### B. Defendants' Affirmative Defenses

Defendants plead numerous affirmative defenses, under a heading of "Affirmative Defenses and Counterclaims," some of them divided into multiple enumerated counts. Because defendants are *pro se* litigants, their pleadings are "liberally construed" and "held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks omitted)*; cf*. Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). Even applying these liberal standards, however, defendants' arguments are not availing, especially when considered in light of evidence adduced at trial.

1.     *Diversity Jurisdiction and Venue*

Defendants dispute the Court's subject matter jurisdiction. For this Court to have subject matter jurisdiction under the relevant provisions of 28 U.S.C. § 1332(a), the amount in

controversy must exceed $75,000 exclusive of interest and costs, and the action must be between citizens of different states. It is not contested that the minimum amount in controversy is met. All that remains is the question of citizenship.

A corporation is a citizen of any state that has incorporated it and of the state where it has its principal place of business. 28 U.S.C. § 1332(c)(1). There is also a subsidiary issue of the Bank of New York's status as a trustee. The United States Supreme Court held in *Navarro Savings Association v. Lee*, 446 U.S. 458 (1980), that "active trustees whose control over the assets held in their names is real and substantial . . . [may] sue in their own right, without regard to the citizenship of the trust beneficiaries." *Id.* at 465–66. Trustees that are "not 'naked trustees' who act as 'mere conduits' for a remedy flowing to others," but rather who have legal title, manage the assets, and control the litigation, are the real and substantial parties to the controversy. *Id.* at 465 (citation omitted)*; see also Universitas Educ., LLC v. Nova Grp., Inc.*, 513 F. App'x. 62, 63–64 (2d Cir. 2013) (rejecting argument for diversity purposes "that a court must *also* consider the citizenship of trust beneficiaries for purposes of subject matter jurisdiction if suit is brought by a trustee").

This case is brought by the Bank of New York Mellon, as Trustee for BS Alt A 2005-9; it is brought by a corporation as a trustee for a trust, and I find that the trustee possesses customary powers to hold and manage assets and is not a "naked trustee." The rule of *Navarro* thus applies: the citizenship of the trust beneficiaries is irrelevant, and the citizenship of the trustee corporation controls for diversity purposes.

Plaintiff Bank of New York Mellon, as Trustee for BS Alt A 2005-9, is a citizen of New York, being organized in New York and having its principal place of business in New York (Pl.'s Ex. 20). The defendants are citizens of Connecticut. There is complete diversity of

citizenship. The amount in controversy exceeds $75,000, exclusive of interests and costs. This Court therefore has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Moreover, because the defendants reside in Connecticut and the real property in question is located in Connecticut, venue is proper in the District of Connecticut under 28 U.S.C. § 1391.

        2.    *Prior Exclusive Jurisdiction*

        The defendants contend that this Court lacks subject matter jurisdiction as a result of the doctrine of prior exclusive jurisdiction. That doctrine is in essence a rule of comity that prevents conflicts from arising between multiple courts attempting to exercise jurisdiction over the same property. Such conflicts are prevented by application of "the principle . . . that the court first assuming jurisdiction over [a] property may maintain and exercise that jurisdiction to the exclusion of the other." *Penn Gen. Cas. Co. v. Pennsylvania*, 294 U.S. 189, 195 (1935); *accord, e.g., Marshall v. Marshall*, 547 U.S. 293, 311 (2006) ("[W]hen one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*."). Despite the years of litigation in state court that precede the present case, that situation of potential conflict does not present itself. The Superior Court granted the withdrawal of the earlier foreclosure action in January 2011, as discussed above. In exercising its discretion to grant that withdrawal, the court observed that pending counterclaims were unaffected, and that if the defendants succeed on those claims, "they may recover punitive damages and legal fees." *Bell*, 2011 WL 383843, at *6. The state court did not contemplate maintaining jurisdiction over the property, but on the contrary, "erase[ed] the court slate clean as though the action had never been commenced." *Id.* at *7 (internal quotation marks omitted) (quoting *H.G. Bass Assocs., Inc. v. Ethan Allen, Inc.*, 26 Conn. App. 426, 431, 601 A.2d 1040 (1992)). The *lis pendens* relating to the state-court action was released in April 2010 (Pl.'s Ex. 14). Jurisdiction in this Court is

therefore proper. Moreover, the defendants have already raised this argument in a motion to dismiss filed on November 27, 2013. That motion to dismiss was denied, and the Court held that the Superior Court no longer had jurisdiction over the property once the earlier action had been withdrawn (Hr'g Tr., Mar. 14, 2014, Doc. #139 at 31–32). That ruling is the law of the case.

3.    *Plaintiff's Standing*

Defendants offer various arguments that plaintiff cannot enforce the note because it is not the owner of the debt, or is not the trustee of the mortgage trust, or cannot demonstrate its right to enforce the note as a result of the complex transactions related to the pooling and servicing of various mortgage loans. To the extent that these arguments seek to defend against foreclosure by purporting that noncompliance with pooling and servicing agreements affects the plaintiff's standing to foreclose, they fail as a matter of law. *See Strong*, 149 Conn. App. at 397–401 (foreclosure plaintiff's alleged noncompliance with a pooling and servicing agreement to which defendant was not a party is not a defense against foreclosure). To the extent that defendants argue that the transfers and assignments culminating in plaintiff's ownership of the debt and the mortgage were otherwise defective, they are unpersuasive. As discussed above, plaintiff offered sufficient evidence to prove it is the holder and transferee of the note and owner of the mortgage, and no evidence has been offered sufficient to rebut it. Trial evidence showed that Wells Fargo possessed the original note, transmitted it to plaintiff's counsel, and that defendant Johnathan Bell personally inspected the original note at the office of plaintiff's counsel in 2010 before this federal litigation began (Doc. #244 at 49).

4.    *Fraud and Lack of Authenticity*

Despite some dispute about whether the mortgage documentation was properly witnessed at the closing, I conclude that there is no doubt that Sonja Bell signed this documentation, and I

further conclude that any possible irregularity with respect to the location of the closing or witnessing of her signature did not conceivably prejudice her rights. *See, e.g.*, *Treglia v. Zanesky*, 67 Conn. App. 447, 454, 788 A.2d 1263 (2001) ("a conveyance of property rights is not automatically nullified by lack of adherence to certain formalities"). Nor is there evidence that defendants timely sought relief from any defect in accordance with the Connecticut Validating Act, Conn. Gen. Stat. § 47-36aa. Having accepted the bank's money, there is no evidence that defendants raised any concern about the documentation until after they defaulted and faced foreclosure.

Defendants also challenge the authenticity of the power-of-attorney (Pl.'s Ex. 132) for the year 2011 from the Bank of New York to Wells Fargo, on grounds that its attachment with listing of trusts (Schedule A) appears to bear a computer-file date stamp that is later than the date on which the power-of-attorney itself was signed. Although no satisfactory explanation emerged for this apparent date discrepancy, I do not conclude that the document is fraudulent when considered in context of the powers of attorney for preceding and succeeding years and the ongoing relationship between the Bank of New York and Wells Fargo. Whether an amended version of Schedule A was attached to the power of attorney does not establish that any original version of Schedule A did not list the applicable trusts to which defendants' loan belonged. Defendants have not shown that Wells Fargo was not authorized to act on the Bank of New York's behalf.

In a related vein, defendants devoted much of their effort at trial to contending that the business records of the various banks and loan servicers in this case were not authentic or admissible. I considered and overruled these objections on grounds that an adequate foundation was laid for admission of these records. In particular, the testimony of Beverly DeCaro as

custodian of records was sufficient to lay a foundation for these records, notwithstanding her lack of first-hand knowledge of the transactions appearing in the company's business records. *See, e.g.*, *RMS Residential. Props.*, 303 Conn. at 235–36.

5. *Statute of Limitations*

Defendants' argument that this action is barred by the statute of limitations overlooks the well-established rule that no statute of limitations otherwise applies to mortgage foreclosure actions. *See, e.g.*, *Fed. Deposit Ins. Corp. v. Owen*, 88 Conn. App. 806, 815, 873 A.2d 1003 (Conn. App. 2005). Defendants otherwise contend that a different statute (Conn. Gen. Stat. § 52-588) applies, but this statute applies only to actions brought on negotiable notes obtained by fraud. Defendants make various allegations of fraud in several of their affirmative defenses, but the burden of proof on their allegations of fraud rests with defendants, and they have not met that burden. As discussed above, there is no evidence establishing fraud. I cannot conclude that defendants were in any way induced into closing on a loan that they did not want or into accepting its proceeds under false pretenses. Defendants' various allegations of fraud are unavailing, and any defense under Conn. Gen. Stat. § 52-588 is thus inapplicable.

6. *Technical Defects in Default Notices*

The defendants allege various technical deficiencies in the default notices, including the lack of authority to issue them, and the failure to give notice of the right to counsel in violation of section 49-6d of the Connecticut General Statutes. The sufficiency of the default notices has already been addressed above. It is disputed whether Mrs. Bell received notice of the right to counsel, but the statute does not by its terms create a private remedy, and there is a presumption in Connecticut law that private enforcement does not exist unless expressly provided by statute. *Gerardi v. City of Bridgeport*, 294 Conn. 461, 468, 985 A.2d 328 (2010); *Bank of New Haven v.*

14

*Liner*, 1993 WL 107819, at *6 (Conn. Super. Ct. 1993) (rejecting reliance on Conn. Gen. Stat. § 49-6d as special defense). The defendants offer no authority for the contention merely that a failure to provide notice of the right to counsel is a defense against foreclosure. Nor can I see any possible prejudice if there had been lack of notice of their right to counsel. Mrs. Bell was represented by Attorney Wittstein at the closing. In addition, defendants extensively litigated against plaintiff in the state court prior to the receipt of their second notice of default and the filing of this federal court action; they were certainly aware of their right to retain counsel to defend against this action.

    7.    *Predatory Mortgage Allegations*

    Defendants further argue that they were subject to a "predatory mortgage." That phrase is widely used but not clearly defined, and defendants did not offer any persuasive evidence that the loan was illegal, or that any alleged illegality entitles them to keep all the proceeds without making any payments. They allege in broad and conclusory terms that the loan was made in violation of public policy and the regulations of numerous federal agencies, but they do not offer evidence that, if those violations are real, there is some private remedy for them, or that they constitute a valid defense to a foreclosure action. To the extent that defendants would rely on state statutory law as grounds for their claim that the mortgage was predatory, the loan originated with a federally chartered savings bank (Ohio Savings Bank), and therefore any state statutory law claim would be preempted. *See, e.g.*, *Lewis v. Wells Fargo Bank, N.A.*, 2014 WL 1429684, at *3 (D. Mass. 2014) (state-law-based predatory lending defense in foreclosure action preempted by federal Office of Thrift Supervision (OTS) regulations); *cf. Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 181–83 (2d Cir. 2005) (discussing preemptive effect of OTS regulations). To the extent that defendants rely on any federal lending regulation as grounds to

invalidate their mortgage, they have not shown that any such regulation gives rise to a private right of action or is otherwise judicially enforceable to defeat a foreclosure action. *See, e.g.*, *In re Ocwen Loan Serv. LLP Mortg. Serv. Litig.*, 491 F.3d 638, 643 (7th Cir. 2005).

        8.     *Other Defenses*

Defendants assert a few other defenses, including spoliation of evidence at some earlier stage of litigation, and perhaps related to various alleged frauds; failure to mitigate damages on the basis that plaintiff allegedly could have recovered from other parties based on alleged agreements to which defendants are neither parties nor third-party beneficiaries; and even a defense that the mortgage trust that owns their debt does not exist. They have not offered credible evidence tending to show spoliation of evidence; they cannot assert as a defense to foreclosure the alleged violation of the rights of third parties; and—notwithstanding defendants' claim to the contrary—I find by a preponderance of the evidence that the mortgage trust that owns their debt and is named in the caption of this case does, in fact, exist.

Defendants' various allegations of a "void complaint" resulting from allegations of the plaintiff's lacking counsel licensed in this state, or plaintiff's counsel lacking authority to pursue the action, or plaintiff's counsel failing to produce documents establishing authority, are not supported by the record, and defendants offer no substantial evidence tending to prove them.

What scattered assertions and arguments remain of affirmative defenses are either not defenses or are not supported by credible evidence. I have considered but find none of defendants' affirmative defenses to be persuasive.

## CONCLUSION

The facts and equities in this case are clear. Both defendants are well educated and have extensive professional work backgrounds. They knowingly accepted a large mortgage loan to

buy and build their home. They became unable or unwilling by 2007 to pay their loan or their property taxes. They then chose to litigate for years rather than to make their payments or to reach a sensible compromise with the bank to vacate a property that they could not afford. On arcane grounds of alleged technical defects that did not actually prejudice them or cause them to be unable to pay, they contend in essence that they are entitled to receive hundreds of thousands of dollars and to have their house and property essentially for free. I conclude that no law or principle of justice requires this to be so.

On the basis of all of the evidence and arguments, I find in plaintiff's favor, and a judgment of strict foreclosure shall enter accordingly. Plaintiff may file any proposed orders to the extent necessary to effectuate the findings and conclusions of this ruling. With respect to plaintiff's request for scheduling of law days and an immediate order of possession of the property (Doc. # 244 at 30), the parties shall jointly submit a proposed consent order to set such schedule; if they are unable to agree on the terms of such an order, the parties shall appear before the Court at 3:30 pm on Thursday, January 8, 2015 for a hearing to set such schedule.

So ordered.

Dated at Bridgeport, Connecticut, this 18th day of December 2014.

/s/_____
Jeffrey Alker Meyer
United States District Judge

17